# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-4025

_____

| | | |
|---|---|---|
| Feng Ying Zheng, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of an Order |
| | * | of the Board of Immigration Appeals. |
| | * | |
| Alberto Gonzales,[1] Attorney General | * | |
| of the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: December 17, 2004
Filed: July 28, 2005

_____

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

Feng Ying Zheng, a citizen of the People's Republic of China, claims she fears persecution if removed to China because of the country's coercive population control policies. Zheng seeks review of the Board of Immigration Appeal's (BIA) final order affirming the Immigration Judge's (IJ) decision denying her application for asylum,

---

[1]Alberto Gonzales has been appointed to serve as Attorney General of the United States, and is substituted as respondent pursuant to Federal Rule of Appellate Procedure 43(c).

withholding of removal, and protection under Article III of the Convention Against Torture (CAT).  Because we find the BIA erred by failing to consider significant evidence supporting Zheng's claim, we conclude the denial of relief was not supported by substantial evidence.  Accordingly, we vacate the BIA's order of removal and remand for further proceedings.

I

Zheng was born on March 12, 1970, in Guantou Village, Lian Jiang City, in the Fujian Province of China.  She entered the United States without inspection on September 12, 1993.  On May 3, 1996, Zheng married Chang Qin Lin.  Zheng and her husband presently have three United States citizen children:  a son, born January 19, 1997; and two daughters, born September 13, 2000, and July 12, 2003.  Zheng's sister and brother live in New York; both have been granted asylum based on China's birth control policies.

On January 3, 1995, Zheng filed an application for asylum.  On July 22, 1999, the Immigration and Naturalization Service, now the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security, commenced removal proceedings against Zheng by issuing a Notice to Appear.  The IJ held an evidentiary hearing on Zheng's application for asylum, withholding of removal, and relief under the CAT on July 18, 2001.  Zheng, her husband, and her sister testified.

At the hearing, Zheng testified she feared returning to China because she believes upon return she will be arrested immediately and either she or her husband will be forcibly sterilized because she had a second child when her first child was a boy.  She testified she and her husband would like to have more children and do not practice any form of birth control.  She testified she fears she will be subject to forced sterilization or abortion because of China's family planning policies.  Zheng further testified her fear of returning to China is also based on the experiences of her sister,

who, after becoming pregnant for the second time, was arrested and given an injection causing an abortion. Zheng stated that prior to her departure from China she did not have problems with China's birth control policy.

Zheng's sister, Feng Zhen Zheng, also testified at the hearing. Zheng's sister testified she was also an applicant for asylum based on China's birth control policy and had appeared before an immigration judge in New York in 2001. The sister testified that when she was six months and seven days pregnant in China, she was forced to abort her second pregnancy and lost a female fetus on July 7, 1998, at Lianjian Hospital in Lianjian City. She testified after she got pregnant she was hiding at her mother's home in Guantou, which is thirty minutes from Lianjian Hospital. Someone reported her and she was arrested at her mother's house by an officer from the birth planning office who then sent her to Lianjian Hospital to have an abortion. Her first child was a boy.

The parties also submitted numerous documents concerning China's population control policies, including the United States Department of State 2001 Country Report on Human Rights Practices in China, United States Department of State's 1998 Profile of Asylum Claims and Country Conditions for China, March 14, 2000, Report by the Canadian government, and an April 2002 Assessment on China prepared by the United Kingdom. Additionally, Zheng submitted an affidavit of John Shields Aird, a specialist on demographic developments and population policy in China, who is also a retired demographer formerly employed at the U.S. Bureau of Census. Aird's affidavit refutes alleged misrepresentations concerning China's coercive population control policy in Department of State reports and documents issued by the Canadian government.

The IJ denied Zheng's application for asylum, withholding of removal, and relief under the CAT on July 12, 2002. The IJ found Zheng had not suffered past persecution in China. The IJ further found Zheng had a subjective fear of future

persecution, but determined Zheng's fear of persecution was not objectively reasonable. Because Zheng failed to meet her burden to demonstrate her eligibility for asylum, the IJ concluded Zheng failed to establish her entitlement to withholding of removal. The IJ also found Zheng failed to meet her burden under the CAT.

The IJ found both Zheng and her husband to be "generally credible." Additionally, the IJ found Zheng's sister to be "generally credible." However the IJ stated she would "not give great weight to the sister's testimony." The following explanation was provided: "[T]his Court did not have the sister's asylum application before this Court to determine the credibility of her own application, with respect to how it affects the respondent's case." Accordingly, the IJ did not analyze Zheng's sister's testimony concerning her forced abortion in determining whether Zheng's fear was objectively reasonable.

Although the IJ found Zheng had a subjective fear of persecution in China, the IJ concluded "the documentation in the record does not objectively support this fear." In determining Zheng's fear was not objectively reasonable, the IJ explained: "The current information in the record regarding China reflects that the forced coercive family planning policies are not being followed in Fujian Province and that Fujian Province is lax on enforcing family planning policies." The IJ found Zheng "failed to also prove to the Court that she would be persecuted because she has had two children born in the United States." The IJ also found "the respondent has failed to show that the threat of persecution exists countrywide," noting "[a]ccording to the country information, there are clearly areas in China in which a person, who wants to have two or more children, even three or four children, can live and have that number of children."

In reaching its finding, the IJ relied primarily on the 2002 UK Assessment and the 2000 report by the Canadian government. According to the 2002 UK Assessment, "[f]or differing reasons, most authorities agree that the Fujian Province is lax in

-4-

implementing the birth control policies" and "[t]he authorities work by incentive schemes rather than coercion, with forced abortion and sterilization no longer tolerated, and efforts to increase the professionalism of family planning workers." The UK Assessment also states "in 1999, there have been signs that the government is beginning to relax its policies in the cities" and "minorities in some rural areas are permitted to have four children." The report prepared by the Canadian government similarly concludes "[t]here is less effective enforcement of the 'one-child' policy [in the Fujian Province] than in other parts of China."

Zheng appealed to the BIA arguing the IJ erred in finding Zheng did not establish a well founded fear of future persecution. Zheng also claimed the IJ violated her due process rights to a full and fair hearing. The BIA dismissed the appeal. The BIA found no merit in Zheng's claims that her due process rights were violated. On the merits, the BIA adopted the facts set forth by the IJ and affirmed the IJ's determinations that Zheng failed to establish eligibility for asylum, withholding of removal, and protection under the CAT. Specifically, the BIA found Zheng "failed to establish that she has suffered past persecution on account of a protected ground, or that she has a well-founded fear of persecution if returned to China to include as a result of their coercive population control policies because she has two United States citizen children."

II

We review the BIA's decision as the final decision of the agency. "To the extent . . . the BIA adopted the findings or the reasoning of the IJ, we also review the IJ's decision as part of the final agency action." Falaja v. Gonzales, 406 F.3d 1076, 1081 (8th Cir. 2005) (citing Ismail v. Ashcroft, 396 F.3d 970, 974 (8th Cir. 2005)). We review the BIA's determination that Zheng failed to establish she is eligible for asylum under a substantial evidence standard. Lau May Sui v. Ashcroft, 395 F.3d 863, 869 (8th Cir. 2005) (citing S-Cheng v. Ashcroft, 380 F.3d 320, 322-23 (8th Cir.

2004)). Under the substantial evidence standard, we will not overturn the BIA's decision unless we find, based on the evidence, "no reasonable fact-finder could arrive at the conclusion reached by the BIA." Id. (quoting S-Cheng, 380 F.3d at 323).

The Immigration and Nationality Act provides the Attorney General the discretion to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(b). A "refugee" is an alien unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). Congress has expanded the definition of "refugee" to include "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program." Id. § 1101(a)(42)(B). Such individuals "shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion." Id.

Zheng does not claim she has suffered past persecution, but claims she has a well founded fear of future persecution if removed to China based on China's coercive population control policies. To establish a well founded fear of future persecution, Zheng must show her fear is "both subjectively genuine and objectively reasonable." Mwangi v. Ashcroft, 388 F.3d 623, 627 (8th Cir. 2004) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987)). "Subjectively, [Zheng] must demonstrate with credible evidence that she genuinely fears persecution; objectively, she must demonstrate through credible, direct, and specific evidence that a reasonable person in her position would fear persecution." Id. (citing Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997)).

We hold the BIA's determination that Zheng failed to establish her fear of persecution was objectively reasonable is not supported by substantial evidence for two reasons.

First, we believe the IJ erred by failing to consider Zheng's sister's testimony about being forced to abort her second child in July 1998 and by relying instead on general reports that since 1999 enforcement of the one-child policy has been lax in Fujian. The fact that in 1998 Fujian family planning authorities forced Zheng's sister to abort her second child when she was six months and seven days pregnant is specific, direct evidence demonstrating Zheng's fear is objectively reasonable. Cf. Nyonzele v. INS, 83 F.3d 975, 983 (8th Cir. 1996) (stating "[a]cts of violence against an alien's family members may demonstrate a well-founded fear of persecution") (citing Arriaga-Barrientos v. INS, 937 F.2d 411, 414 (9th Cir. 1991)); Makonnen v. INS, 44 F.3d 1378, 1385-86 (8th Cir. 1995) (holding acts of persecution against immediate family member with similar political views and active in similar political activities is relevant to show well-founded fear of persecution); accord Zhang v. Gonzales, 408 F.3d 1239, 1249 (9th Cir. 2005) (stating "'acts of violence committed against an applicant's friends or family can establish well-founded fear of persecution'") (quoting Nagoulko v. INS, 333 F.3d 1012, 1017 (9th Cir. 2003)); Zhang v. Ashcroft, 388 F.3d 713, 718 (9th Cir. 2004) (noting "treatment of [ ] similarly situated family members is highly indicative" of persecution petitioner would encounter upon return).

Although the IJ found Zheng's sister's testimony to be credible, the IJ did not consider it in determining whether Zheng's fear was objectively reasonable, explaining: "[T]his Court did not have the sister's asylum application before this Court to determine the credibility of her own application, with respect to how it affects the respondent's case." We find the IJ's explanation for giving little weight to Zheng's sister's testimony difficult to understand. If the IJ heard the sister's testimony and found her to be credible, it is unclear to us why the IJ needed to consider

separately the credibility of the sister's asylum application in order to accept the sister's testimony.

The government argues it was appropriate for the IJ to rely on country reports in concluding Zheng's fear was not objectively reasonable. As the government notes, we have stated "Department of State country condition reports are persuasive authority for determining whether an asylum-seeker has a well-founded fear of persecution." Perinpanathan v. INS, 310 F.3d 594, 599 n.1 (8th Cir. 2002) (citations omitted). However, as other courts have cautioned, "use of such official report does not substitute for an analysis of the facts of each applicant's individual circumstances." Krastev v. INS, 292 F.3d 1268, 1277 (10th Cir. 2002); accord Lin v. Ashcroft, 385 F.3d 748, 754 (7th Cir. 2004). By failing to consider Zheng's sister's testimony about her forced abortion, which the IJ found credible, the IJ failed to analyze significant credible concrete evidence demonstrating Zheng's fear is objectively reasonable.

Moreover, Zheng's sister's testimony, and Zheng's fears, are corroborated by the State Department reports. For example, the State Department's 2001 Country Report provides:

> Central Government policy formally prohibits the use of force to compel persons to submit to abortion or sterilization; however, intense pressure to meet family planning targets set by the Government has resulted in documented instances in which local family planning officials have used coercion, including forced abortion and sterilization, to meet Government goals. During an unauthorized pregnancy, a woman often is paid multiple visits by family planning workers and pressured to terminate the pregnancy. Senior officials have stated repeatedly that the Government "made it a principle to ban coercion at any level." Senior officials acknowledge that problems persist and insist on the Government's determination to address such problems. . . .

According to the State Department's 1998 Profile, "[i]n 1996 there were credible reports that several women were forced to undergo abortion in Fujian." Additionally, under the section entitled "Actual Implementation and Practice," the 2002 UK Assessment notes: "Government officials have acknowledged that there have been instances of forced abortions and sterilisations [sic], and there are anecdotal accounts of raids on rural villages by task forces rounding up women for forced sterilisation [sic] or abortion. . . . There are still, in 1999, routine allegations of enforced sterilisations [sic], particularly in rural areas, and regular re-enforcement of regulations."

We also believe the BIA's determination that Zheng failed to demonstrate children born in the United States are treated the same as children born in China is not supported by substantial evidence because it fails to take into account the information provided by Aird's affidavit. In his affidavit, Aird refutes the finding in the 1998 Profile that children born to Chinese nationals living abroad are not counted under China's family planning rules. According to Aird,

> The agency admits that it cannot cite an official source authorizing especially lenient treatment for the parents of U.S.-born children. There is no provision for such special treatment in any of the national or provincial policy regulations and directives that have been made public. The [State Department] bases its argument on what it calls "anecdotal information"—alleged statements by individual Chinese in four Chinese cities, mainly family planning officials. However, family planning officials in China, from the top leadership in the SFPC down to the local level, have an interest in giving a deceptively moderate impression of program enforcement in order to counter the adverse publicity generated by actual case histories of extreme punitive measures applied to particular Chinese couples. . . .

Aird notes "[t]he [1998 Profile] quotes a Chengdu (Sichuan) university graduate as saying that 'a married woman going abroad from her city can have a

second child and return without penalty if one member of the couple gets an American graduate degree.'" According to Aird, "[t]his may be true in some cases, particularly because of Chinese government concerns about the 'brain drain' resulting from the failure of Chinese graduate students to return home after the end of their training." Aird states "[s]uch exceptions, however, are not available to most Chinese asylum seekers." Aird's affidavit includes several examples of statements from Chinese officials indicating the one-child policy applies to Chinese couples living abroad. Aird concludes: "The reason why the Chinese family planning authorities attempt to enforce family planning rules on their nationals living abroad is that to ignore their violations would tend to undermine the enforcement of the rules in China. The Chinese authorities cannot afford to let rumors get about that couples of childbearing age can evade the one-child limit by leaving the country illegally, having unauthorized children in foreign countries, and returning home without suffering the standard penalties."

In <u>Guo v. Ashcroft</u>, 386 F.3d 556, 565 (3d Cir. 2004), the Third Circuit addressed the evidentiary impact of a similar affidavit Aird submitted criticizing the 1998 Profile's findings regarding the applicability of the one-child policy to children born in the United States. The Third Circuit concluded "where a motion to reopen is accompanied by substantial support of the character provided by the Aird affidavit, the Government's introduction of a five-year-old State Department report, without more, hardly undermines [the petitioner's] *prima facie* showing." <u>Id.</u> We likewise believe the BIA erred in determining Zheng failed to show she would be subject to China's one-child laws without addressing the evidence presented in Aird's affidavit.

The government argues the instant case presents the same circumstances as those presented in our decision in <u>S-Cheng v. Ashcroft</u>, and that <u>S-Cheng</u> requires we affirm in the instant case. We disagree. In <u>S-Cheng</u>, Cheng filed an application for asylum in May 1994 falsely claiming she had been involved in democratic protests in China. 380 F.3d at 321. In July 2000, Cheng withdrew her 1994 asylum

application and filed a new one in which she claimed she feared persecution under China's coercive population control policies. Id. at 321-22. At the hearing, Cheng testified she was born in the Fujian Province and was the oldest of six children. She testified local authorities harassed her mother for violating China's one-child policy and forced her mother to submit to sterilization after the birth of the fourth child. The operation failed, and Cheng's mother gave birth to two additional children. She testified her mother was forced to submit to the insertion of an IUD device, which she had removed. Id. at 322. Cheng claimed she feared she would be subject to forced sterilization if returned to China because she had a son who was born in the United States. When asked whether her husband and son would accompany her to China if deported, Cheng stated "my husband and son[] will not allow me back to China because we all have, our house, everything is here." Cheng testified she and her husband planned to have more children. She also admitted she lied in her earlier application for asylum. Id.

The IJ determined Cheng was not credible. Id. at 323. Furthermore, the IJ concluded Cheng's fear of forced abortion and sterilization was based on speculative facts. Id. The BIA dismissed the appeal. Id. at 322. We denied Cheng's petition for review. We affirmed BIA's adoption of the IJ's finding that Cheng lacked credibility because Cheng lied in her entry application and first asylum application. Id. at 323. We held that based on Cheng's track record, the BIA had a reasoned basis to disbelieve Cheng's claims that she planned to have a second child and subjectively feared China's population control policies. Id. We also found substantial evidence supported the BIA's finding Cheng's fear of forced abortion and sterilization was not objectively reasonable because it was based on hypothetical and speculative facts. Id. We found Cheng did not show she was in violation of the one-child policy by having a United States born child *living in the United States*, and that it was speculative to conclude Chinese authorities would learn of the child in the United States. This was based on Cheng's testimony suggesting her husband and son would not accompany her to China. Id. We noted according to State Department and

-11-

Canadian reports, the Chinese government had replaced sanctions with incentives to encourage compliance with the law, there was no evidence of forced sterilizations or abortions in recent years particularly in Cheng's province, and Chinese authorities urged sterilizations after a second or third child, and up to a third of families in Cheng's province had three or more children. Id.

There are more pertinent differences than pertinent similarities between our decision in S-Cheng and the instant case. In S-Cheng, the IJ found Cheng lacked credibility and did not have a subjective fear of persecution. In the instant case, the IJ found Zheng to be credible and found Zheng had a subjective fear of persecution based on China's coercive population control policies. In S-Cheng, we held Cheng failed to provide credible specific evidence demonstrating her fear of forced abortion or sterilization was objectively reasonable. In the instant case, Zheng presented credible specific evidence by introducing the testimony of her sister concerning her forced abortion in China. In S-Cheng, Cheng failed to provide evidence demonstrating forced sterilizations or abortions occurred in recent years to rebut the general reports that implementation of the one-child policy was becoming lax in the Fujian Province. In the instant case, Zheng's sister's testimony undercuts such claims that forced abortions or sterilizations no longer occur in Fujian. In S-Cheng, we found that Cheng's testimony suggested she would not take her United States born child to China if forced to leave the United States and thus concluded Cheng failed to show Chinese officials would find out about her *son in the United States*. In the instant case, there is no evidence suggesting Zheng would leave without her three children and husband if removed to China. Moreover, Zheng presented Aird's affidavit which concludes Chinese authorities would have reason to enforce the one-child policy against United States born children. In S-Cheng, we held substantial evidence supported the BIA's determination Cheng's claim she wanted to have more children was not credible. In the instant case, the IJ found credible Zheng's claim she planned to have more children.

-12-

"When an agency makes a finding of fact without mentioning or analyzing significant evidence, its decision should be reconsidered." Habtemicael v. Ashcroft, 370 F.3d 774, 783 (8th Cir. 2004) (citing Palavra v. INS, 287 F.3d 690, 693 (8th Cir. 2002)).  Because we believe the BIA erred by failing to consider significant evidence, we vacate the BIA's order denying Zheng's application for asylum and remand the case for reconsideration in light of this evidence.

Additionally, because the BIA denied Zheng's request for withholding of removal without considering Zheng's sister's testimony and Aird's affidavit, we remand Zheng's request for withholding of removal for reconsideration in light of our holding with respect to Zheng's asylum claim.

III

The government contends we lack jurisdiction to review Zheng's request for protection under the CAT because Zheng failed to exhaust administrative remedies with respect to the claim.  According to the government, in her brief to the BIA Zheng only argued she demonstrated a well founded fear of persecution, and because the standard of proof for a claim under the CAT differs from the standard of proof for an asylum claim, the government contends Zheng failed to appeal to the BIA the denial of the CAT claim.  This argument is without merit.  Zheng explicitly asked for relief from the IJ's denial of relief under the CAT in her brief to the BIA.  Moreover, in its decision, the BIA specifically considered and dismissed Zheng's appeal of the denial of her claim under the CAT.  Thus, in light of our holding with respect to Zheng's application for asylum, we remand for reconsideration Zheng's request for protection under the CAT.

IV

Although we have already decided to remand Zheng's claims to the BIA based on the BIA's failure to analyze significant evidence, we consider Zheng's due process arguments at this time because our determination of Zheng's due process claims could impact the nature of the proceedings on remand. Compare Palavra, 387 F.3d at 694 (remanding for further consideration after finding agency failed to analyze significant evidence), with Al Khouri, 362 F.3d at 467 (remanding for new hearing after finding due process violation).

Zheng contends the IJ violated her due process rights by showing bias and denying her a full and fair hearing. "The Fifth Amendment's due process clause mandates that removal hearings be fundamentally fair." Al Khouri v. Ashcroft, 362 F.3d 461, 464 (8th Cir. 2004) (citing Reno v. Flores, 507 U.S. 292, 306 (1993); Castaneda-Suarez v. INS, 993 F.2d 142, 144 (7th Cir. 1993); Plyler v. Doe, 457 U.S. 202, 210 (1982)). "'To demonstrate a violation of due process, an alien must demonstrate both a fundamental procedural error and that the error resulted in prejudice.'" Id. at 466 (quoting Lopez v. Heinauer, 332 F.3d 507, 512 (8th Cir. 2003)). "'Actual prejudice exists where defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.'" Id. (quoting United States v. Torres-Sanchez, 68 F.3d 227, 230 (8th Cir. 1995)).

Zheng argues that in denying her requests for relief, the IJ made statements demonstrating bias. We have reviewed the transcript of the hearing and do not believe any statements the IJ made during the hearing demonstrate bias to establish Zheng did not receive a full and fair hearing.

Zheng also contends the IJ violated her right to a full and fair hearing when the IJ stopped Zheng's testimony of her opinion about the Chinese government's family planning policy. The IJ also refused to permit Zheng's attorney to proceed on a line

-14-

of questioning stating she did not "want to hear their whole asylum case over again." As the government argues, Zheng's attorney intended to elicit this testimony from Zheng to demonstrate "she knows the policy exists and what's the policy and why she has that fear." Because the IJ found Zheng to be credible and that Zheng has a subjective fear of persecution, Zheng cannot demonstrate prejudice. We agree.

Zheng also alleges the IJ erred by proceeding without Zheng's attorney and calling the attorney's paralegal to translate for Zheng over the telephone. According to the government, the IJ attempted to hold a hearing on October 4, 2001 for which Zheng's attorney was to appear telephonically. Zheng's attorney's cellular phone disconnected three times. The IJ ended the hearing and called Zheng's attorney's office to inform Zheng in a language she could understand that the proceedings were being continued at the government's request. We agree with the government and hold Zheng's argument on this point is without merit.

## V

We vacate the BIA's order of removal and remand for further administrative proceedings consistent with this opinion.

_____